IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KATHLEEN M. BARR, Trustee under that certain unrecorded Kathleen M. Barr Trust dated September 7, 2006, et al., | ) ) ) ) ) | Civ. No. 05-00125 DAE-LEK |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| CITY AND COUNTY OF HONOLULU, a municipal corporation of the State of Hawaii, | ) ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

ORDER (1) DENYING PLAINTIFFS' MOTIONS FOR PARTIAL
SUMMARY JUDGMENT; (2) GRANTING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
(3) DISMISSING STATE LAW CLAIMS

On June 26, 2009, the Court heard Plaintiffs' Motions for Partial

Summary Judgment and Defendant's Motion for Partial Summary Judgment.

David A. Nakashima, Esq., and J. Blaine Rogers, Esq., appeared at the hearing on

behalf of Plaintiffs; Deputy Corporation Counsel Don S. Kitaoka appeared at the

hearing on behalf of Defendant City and County of Honolulu (the "City").  After

reviewing the motions and their supporting and opposing memoranda, the Court

DENIES Plaintiffs' motions, GRANTS Defendants' motion, and DISMISSES all remaining state law claims.

BACKGROUND

In 1991, the City Council of Honolulu (the "City Council"), recognizing a history of estate landownership and a resulting rise in land prices, passed an ordinance, which was later codified at Chapter 38 of the Revised Ordinances of Honolulu ("Chapter 38"). (Def.'s Concise Statement of Facts ("CSF") in Support of its Motion ("Def.'s CSF") ¶ 1.)[1] Chapter 38 created a mechanism allowing owners of leasehold interests in condominium units to convert their leasehold interests into fee interests by using the City's power of eminent domain. (Def.'s CSF ¶ 2; Def.'s Ex. A, B.) Chapter 38 and its corresponding rules established the authority, conditions, and procedure by which condominium lessees could pursue such ownership. (Id.)

The procedure laid out by Chapter 38 and the rules entailed several steps before condemnation and transfer to the lessee occurred. (Pls.' Ex. 2, Chapter 38.) Individual condominium lessees would first file an application and sign a contract with the City. (Pls.' Ex. 2, Rules for Residential Condominium,

---

[1] When referencing undisputed facts, this Court will cite to the moving party's CSF.

Cooperative and Planned Development Leasehold Conversion (the "Rules") ¶ 2-4.) The City's Department of Community Services ("DCS")[2], the agency tasked with administering the condemnation and conversion process, would then undertake a preliminary evaluation of the applications.  (Id. ¶ 2-5.)  If a sufficient number of qualified lessees within a particular complex met the requirements of Chapter 38, the director of DCS (the "Director") would notice a public hearing to discuss whether the exercise of eminent domain for that complex was in the public interest. (Id. ¶ 2-6.)  After conducting the hearing, the Director would make a finding as to whether eminent domain was, in fact, in the public interest and, if applicable, grant the lessees final approval.   (Id. ¶¶ 2-7, 2-10.)  The Director would then designate the relevant condominium units for conversion and request counsel for the City to prepare and present to the City Council a resolution for the exercise of eminent domain power.  (Id. ¶ 2-12.)

Finally, before condemnation could begin, Chapter 38 required the City Council to adopt a resolution establishing that the exercise of eminent domain power was necessary for the public interest, approving the exercise of such power, and appropriating the necessary funds to pay just compensation.  (Id.)  Only after

---

[2]DCS was originally named the Department of Housing and Community Development.

all of these steps were completed would the City condemn the appropriate units

and convey the appurtenant land to the lessee in fee simple.  (Id. ¶ 2-18.)

As noted above, the lessee-applicants were required to execute a

contract with the City to undertake the process outlined in Chapter 38.  The

contract, entitled "Leased Fee Interest Purchase Contract," announced various

terms relating to the obligations of both parties in pursuing condemnation and

conversion ("Contract").  (Pls.' Ex. 1, 1A.)  The Contracts obligated the parties to

use their best efforts to convert the property through the City's power of eminent

domain.  Specifically, the Contracts stated:

> T.  Required Action by the Parties.  Each party named in
> this instrument agrees to execute the instruments and to
> diligently undertake the acts necessary to consummate
> the transaction contemplated by the Agreement.  Each
> party shall use its best efforts to consummate the
> transaction contemplated by this instrument.
> . . .
> W.  Required Actions of Buyer and City.  Buyer and City
> agrees to execute such instruments and documents and to
> use their best efforts to perform the actions required in
> order to consummate the transaction contemplated by this
> instrument.

(Pls.' Ex. 1A ¶ 12.)  Each Contract was identical and secured by $1,000

consideration.  (Pls.' Ex. 1 at 1.)

The Contracts also explicitly incorporated Chapter 38 and its corresponding Rules and noted that any conflict between any of these provisions and the Contracts would be resolved in favor of the provisions. (Pls.' Ex. 1A ¶ 5.) In addition, the lessee expressly agreed in the Contract that he understood "changes in zoning, land use, ordinances, rules, regulations and adverse governmental actions" could occur that could affect the intended conversion. (Id. ¶ 3.)

In 1996, DCS began processing Chapter 38 applications from lessees at a condominium complex located at 1778 Ala Moana Boulevard and known as Discovery Bay. (See, e.g., Pls.' Ex. 3.) Several lessees submitted applications, entered into Contracts, and paid the $1,000 fee (the "Discovery Bay Lessees" or "Plaintiffs"). (Id.) After obtaining initial approval by DCS, the Director held a properly noticed public hearing to determine whether acquisition of the leased condominiums using the power of eminent domain would effectuate a public purpose. (Pls.' Ex. 4 ¶ 9.) On August 3, 2004, the Director made a finding of Effectuation of Public Purpose. (Pls.' CSF in Support of Plaintiffs' Motion ("Pls.' CSF") ¶ 1.) On November 4, 2004, DCS designated thirty-three leasehold interests for acquisition under Chapter 38. (Def.'s CSF ¶ 17.)

Shortly thereafter, the City Council began consideration of several proposals to repeal Chapter 38. On January 26, 2005, after entertaining numerous

5

bills and amendments, the City Council passed Bill 53, codified as Ordinance 05-001.  (Pls.' CSF ¶ 15; Pls.' Ex. 15, 16.)  Ordinance 05-001 specifically found that Chapter 38 was no longer necessary to advance a public purpose.  (Pls.' Ex. 15 at 1-2.)

> [T]he purpose of Chapter 38 was to provide affordable housing and to strengthen the economy through fee ownership.  Ordinance 91-95 lists "runaway land prices," "shortage of fee simple residential condominiums," "artificial inflation of land values," "lessees forced to access long-term leases . . . which contains terms and conditions which are financially disadvantageous to them," "land values, artificially inflated by concentrated or single ownership," and "potential for economic instability and disruption on Oahu" as public purpose furthered by Chapter 38.
>
> The council finds that mandatory conversion of multi-family residential leaseholds under Chapter 38 is no longer needed to assuage the social and economic problems mentioned in Ordinance 91-95 and, therefore, no longer advances a public purpose for which the city should exercise its extraordinary powers of condemnation.  The social and economic problems listed as the public purposes furthered by Chapter 38 do not exist today to the same extent as they may have existed in 1991.
>
> The council further finds that a lessee purchasing a residential leasehold unit knew or should have known about the negative aspects of the lease prior to the purchase.  Since 1990, such a lessee should have received a copy of the underlying lease.  Since 1991, the lessee should have received a simplified disclosure of the

> salient terms of the lease agreement, including but not
> limited to, the remaining term of the lease, the rent
> renegotiation dates, the potential for significant increases
> in renegotiated rents, and the surrender clause.

(<u>Id.</u>)

In addition, Ordinance 05-001 adopted a "savings clause," which may have been drafted by James Mee, Esq. ("Mee"), an attorney for several lessors, and which clarified that only those units that were already designated by DCS for acquisition <u>and</u> approved by the City Council could "grandfather in" to the Chapter 38 process (the "Savings Clause").  (Pls.' CSF ¶¶ 7, 9; Def.'s CSF in Opposition to Plaintiffs' Motion ("Def.'s CSF in Oppo.") ¶ 9; Pls.' Ex. 11.)  Any lessees who failed to meet both of the conditions outlined in the Savings Clause would no longer be able to pursue conversion.  (Pls.' Ex. 15 at 2-3.)  Ordinance 05-001 and its Savings Clause became law on February 9, 2005.  (<u>Id.</u> at 4.)

The Discovery Bay Lessees were not covered by the Savings Clause because the City Council had never adopted a resolution approving conversion and finding that condemnation would effectuate a public purpose.  (Pls.' CSF ¶ 16; Pls.' Ex. 15 at 2-3.)  As such, the Discovery Bay Lessees were unable to pursue condemnation and conversion pursuant to Chapter 38.  (Pls.' CSF ¶ 18; Pls.' Ex. 15 at 2-3.)

7

The Discovery Bay Lessees filed the instant action against the City on February 25, 2005.  After denying a motion for a preliminary injunction filed by Plaintiffs, the Court then heard motions for summary judgment from both parties.  On July 19, 2005, this Court issued an order denying Plaintiffs' motion and on October 27, 2005, this Court granted summary judgment on all claims in favor of the City.  Following Plaintiffs' timely appeal, the Ninth Circuit vacated the Court's ruling and remanded for further proceedings.  See Matsuda v. City and County of Honolulu, 512 F.3d 1148, 1154 (9th Cir. 2008)[3].

On April 21, 2008, Plaintiffs filed an Amended Complaint (the "FAC").  The FAC asserted the following causes of action:

(1)    violation of the Contracts Clause, U.S. Const., art. I, § 10;

(2)    violation of substantive due process guaranteed by the Fourteenth Amendment;

(3)    violation of federal rights under 42 U.S.C. § 1983;

(4)    breach of contract;

(5)    specific performance;

(6)    declaratory relief; and

---

[3]The original title Plaintiff, Sally A. Matsuda, died and was substituted by Kathleen M. Barr.  (Doc. # 85.)

8

(7)     injunctive relief.

(FAC at ¶¶ 26-60.)

        In the interim, Judge J. Michael Seabright issued an order in a virtually identical case[4], involving another set of plaintiff-applicants seeking to condemn their condominium units in a complex called the "Admiral Thomas."  See Young, et al. v. City and County of Honolulu, Civ. No. 07-00068 JMS/LEK (the "Admiral Thomas case").  In an order dated April 30, 2009, Judge Seabright granted summary judgment in favor of the City on the plaintiffs' Contracts Clause and substantive due process claims and dismissed the remaining state law claims.  (Admiral Thomas case, Doc. # 137.)  The Admiral Thomas case is currently on appeal to the Ninth Circuit.

        On May 22, 2009, Plaintiffs filed two separate motions for partial summary judgment in the instant case.  One motion moved for summary judgment as to Counts I and III under federal law (Doc. # 118), while the other moved on the state law claims asserted in Counts IV and V (Doc. # 116).  On June 8, 2009, the

_____

        [4]The Court notes there are small differences in facts between the Admiral Thomas case and the instant case.  The parties agree, however, that the dispositive facts regarding the Contracts and the repeal of Chapter 38 are the same for purposes of assessing the federal claims.

9

City filed oppositions to each motion.  (Doc. ## 122, 124.)  Plaintiffs filed a

consolidated reply in support of both motions on June 15, 2009.  (Doc. # 129.)

Likewise, on May 22, 2009, the City moved for partial summary

judgment as to Counts I, II, III, VI, and VII.  (Doc. # 114.)  Plaintiffs filed an

opposition on June 8, 2009.  (Doc. # 126.)  On June 15, 2009, the City replied.

(Doc. # 130.)

STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the

pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't

of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d

1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of

factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317,

323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See Id. at

323.  A moving party without the ultimate burden of persuasion at trial -- usually,

but not always, the defendant -- has both the initial burden of production and the

10

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &
Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden
initially falls upon the moving party to identify for the court those "portions of the
materials on file that it believes demonstrate the absence of any genuine issue of
material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d
626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

        Once the moving party has carried its burden under Rule 56, the
nonmoving party "must set forth specific facts showing that there is a genuine
issue for trial" and may not rely on the mere allegations in the pleadings.  Porter,
419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256
(1986)).  In setting forth "specific facts," the nonmoving party may not meet its
burden on a summary judgment motion by making general references to evidence
without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,
889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary
judgment, the court shall have no independent duty to search and consider any part
of the court record not otherwise referenced in the separate concise statements of
the parties.").  "[A]t least some 'significant probative evidence'" must be
produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v.
Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence

11

that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id. However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

## DISCUSSION

Both Plaintiffs and the City move for summary judgment as to Counts I and III, regarding the allegation that the City violated the Contracts Clause to the United States Constitution and thereby violated Plaintiffs' constitutional rights. The City also moves for summary judgment with respect to Count II, Plaintiffs' claim that Defendant violated their substantive due process rights under the

12

Fourteenth Amendment.  The Court will address these federal claims first before considering the remaining state law claims on which the City moved.

I.      Count I: Contracts Clause

Plaintiffs contend that the City Council, by passing Ordinance 05-001, impaired their Contracts with the City in violation of the Contracts Clause of the United States Constitution.  The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10. The Supreme Court has construed this prohibition narrowly, however, in order to ensure that local governments retain the flexibility to exercise their police powers effectively.  See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240 (1978). Nevertheless, the Court has made clear that when a state's action interferes with its own contractual obligations, as opposed to mere private contracts, the action must be examined with a higher level of scrutiny.  See U.S. Trust Co. v. New Jersey, 431 U.S. 1, 20-21 (1977).

The Ninth Circuit has explicitly mandated that this heightened scrutiny test apply in examining Ordinance 05-001.  See Matsuda, 512 F.3d at 1152.  This test, first announced in U.S. Trust, requires the Court to consider:

>   (1) whether the state law has, in fact, operated as a
>   substantial impairment of a contractual relationship;

13

(2) whether the state law is justified by a significant and legitimate public purpose; and
(3) whether the impairment resulting from the law is both reasonable and necessary to fulfill [such] public purpose.

Id. (internal citations and quotation marks omitted).

In determining the first factor of the U.S. Trust test, whether the state law has "operated as a substantial impairment of a contractual relationship," the Supreme Court has subdivided the inquiry into three distinct components. See Univ. Of Hawaii Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1101 (9th Cir. 1999) (quoting Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (internal quotation marks omitted)). In particular the court must ask: (1) "whether there is a contractual relationship;" (2) "whether a change in law impairs that contractual relationship;" and (3) "whether the impairment is substantial." Seltzer v. Cochrane, 104 F.3d 234, 236 (9th Cir. 1996) (quoting Gen. Motors Corp., 503 U.S. at 181); Matsuda, 512 F.3d at 1155.

In this case, the parties do not dispute the presence of a contractual relationship. (Pls.' CSF ¶ 2.) As such, the Court turns to the question of whether Ordinance 05-001 in fact impaired that contractual relationship. The City urges this Court to adopt the reasoning used by Judge Seabright in the Admiral Thomas case and argues that Ordinance 05-001 does not impair the contractual relationship

between the parties because the Contracts themselves were conditional on several events occurring before condemnation would begin.  In particular, the City, citing the reasoning used by Judge Seabright, contends that the language of the Contracts specifically recognizes that the City Council would have to approve a resolution finding that the exercise of eminent domain power was necessary for the public purpose and that the Contracts were subject to changes in local rules, ordinances, and other adverse governmental actions.  As such, the City asserts that Ordinance 05-001 did not impair the Contracts because the Contracts never obligated the City to condemn the units in the end.

Plaintiffs respond by arguing that Judge Seabright and the City's reading of the Contracts improperly elevates the provisions of the Contracts dealing with the City Council's discretion over other provisions which require it to employ its best efforts to effectuate condemnation.  Plaintiffs argue that the City's position is self-serving, resulting in an illusory contract which in no way binds the City.

This Court agrees with Judge Seabright's conclusion.  Plaintiffs are correct that the Contracts obligate the City to use its best efforts to effectuate a condemnation of the condominium units.  (Pls.' Ex. 1A ¶¶ 12T, 12W.)  However, the Contracts are also very clear in recognizing that condemnation is in no way

guaranteed.  Indeed, the Contracts specifically condition condemnation upon -- among other things -- a resolution by the City Council determining that a public purpose exists for the exercise of eminent domain power.  (Id. ¶¶ 4A, 5.)  While the City agrees to use its best efforts to pursue its exercise of eminent domain power, it never waives or surrenders its ultimate discretion to make a finding of public purpose.  In fact, the Contracts explicitly contemplate the exercise of such discretion.

The discretion to exercise the power of eminent domain lies with the City Council alone.  See Richardson v. City & County of Honolulu, 868 P.2d 1193, 1205-06 (Haw. 1994) (explaining the powers authorized by Chapter 38).  In Richardson, the Hawaii Supreme Court specifically held that Chapter 38 only empowered DCS to designate certain units for acquisition and facilitate the process under Chapter 38.  Id.  In contrast, the City Council retained the sole authority to exercise the power of eminent domain.  Id.  The Contracts, specifically incorporating Chapter 38 and its corresponding Rules, do not, therefore, obligate the City to condemn and convey units but rather contemplate all of the steps that must be taken before condemnation and conversion are complete.

The Hawaii Supreme Court has also held that Chapter 38 "does not mandate that the City condemn the [property designated by the DCS]."  City and

<u>County of Honolulu v. Sherman</u>, 129 P.3d 542, 573 (Haw. 2006)[5].  The Contracts

were merely the preliminary step in a long procedure that eventually may or may

not result in condemnation and conversion.  As such, the best efforts provision can

---

[5]Moreover, the Ninth Circuit has recognized the conditional nature of the anticipated condemnation in the Contracts in this case and stated that the City was not required to condemn.  <u>Matsuda</u>, 512 F.3d at 1154.  <u>Matsuda</u> instructs:

> As an initial matter, the City's contracts with the Lessees did not expressly require the City to condemn the property at Discovery Bay. As discussed above, Chapter 38 imposed several requirements for a successful condemnation which were beyond the City's power to control, and the City only agreed to use its best efforts to achieve those results. Thus, if an insufficient number of condominium owners applied to the City or if the public hearing held by the Department failed to produce a finding that condemnation would serve a valid public purpose, the City would not have been obligated under the contracts to proceed with the condemnation.
>
> More importantly, however, the City's contracts with the Lessees do not restrict its ability to exercise its eminent domain power in any way. The contracts reflect the City's voluntary undertaking to use its best efforts to effect a condemnation of the property at Discovery Bay and to convey that property to the Lessees if successful. The contracts do not purport to require the City to refrain from the exercise of any sovereign power, including the power of eminent domain.  Instead, the contracts reflect the City's decision to initiate proceedings to exercise its power of eminent domain over the property at Discovery Bay, and to convey the property to the Lessees if successful.

<u>Id.</u> (footnote omitted).

17

hardly be construed as meaning that DCS was contract-bound to approve Plaintiffs' applications, designate the properties for acquisition, and request corporation counsel propose a resolution for the City Council.  Nor can such language be construed as forcing the City Council -- in violation of Hawaii law -- to find a public purpose supporting the exercise of eminent domain power for such Contracts.

The Court's reading of the Contracts does not, as Plaintiffs contend, improperly elevate the discretionary aspects of the Contracts over the best efforts provision.  (Pls.' Mot. Counts I & III at 41-45.)  Reading the Contracts as a whole, it is clear from the face of the Contracts that condemnation was the ultimate goal to which each party aspired.  Condemnation was not, however, a result to which the City obligated itself.

To read otherwise, as Plaintiffs would have the Court do, would in fact impermissibly elevate the best efforts clause over all other aspects of the Contracts.  The logical extension of Plaintiffs' argument is that any action taken by the City Council which does not result in condemnation constitutes a breach of the best efforts provision.  Such a reading would require the City Council to always find a public purpose and strip the City Council of its inherent authority to exercise the power of eminent domain.  The Contracts simply cannot be read as creating an

obligation on the part of the City to complete condemnation or an absolute right of the Plaintiffs to have their unit conveyed to them using this process.

Nor does the Court's reading of the Contracts insert a "condition precedent" in order for the Contracts to be binding on the parties. (Pls.' Oppo. at 23-29.) Not all of the rights and obligations of the parties are conditioned upon the happening of certain events. Instead, the Contracts immediately bind the parties to certain obligations upon execution. For instance, the City is immediately bound to employ its best efforts to effectuate a condemnation. That obligation is not conditioned on any event other than execution of the Contracts. What is conditional, however, is the end result of condemnation.

Plaintiffs argue that Ordinance 05-001 impaired their contractual relationship with the City because it prevented any contractual remedy and recovery of damages. (Pls.' Mot. Counts I & III at 17-20.) Citing Cayetano, Plaintiffs contend that the repeal of Chapter 38 thwarted their opportunity to pursue condemnation and "slam[med] the door on any effective remedy." 183 P.3d at 1104. This Court disagrees. While it is true that Plaintiffs may no longer pursue condemnation due to the passage of Ordinance 05-001, such a remedy was never guaranteed by the Contract. Instead, Plaintiffs may have a viable cause of action for breach of contract and/or breach of the implied duty of good faith and

fair dealing despite passage of Ordinance 05-001.[6]  The Contracts obligated the

City to employ its best efforts in pursuing condemnation.  Should Plaintiffs prove

that the City failed to use its best efforts and, for instance, intentionally delayed

consideration of Plaintiffs' applications, they may be able to recover damages for

such a breach.  The fact that the City has pled that it cannot be held liable for a

breach because the Contracts are now "null and void" is of no moment.

Determination of liability rests not with the City but with a court of law and,

ultimately, a jury.

Plaintiffs also argue that the Savings Clause only serves to underscore

the illegitimacy of the reasoning articulated in Ordinance 05-001.  Plaintiffs

contend that if, in fact, the City Council has determined there is no longer a public

purpose being served by Chapter 38 condemnations, then there can be no

constitutional basis for allowing certain applications to go forward under the

Savings Clause.

Plaintiffs forget, however, that the Savings Clause only allows those

applications to proceed for which the City Council had already made an explicit

---

[6]This Court makes no express finding as to the ultimate viability of a claim
for breach of contract or breach of the duty of good faith a fair dealing.  The Court
merely references such remedies to illustrate that Ordinance 05-001 did not "slam
the door on any effective remedy."

finding of public purpose.  As Plaintiffs point out, such a line was constitutionally necessary because the power of eminent domain may only be exercised when done for a public purpose.  Absent a finding of public purpose, the City Council is barred from exercising their power.  The Savings Clause, by limiting itself to only those applications for which there has been a finding of public purpose, adequately draws the line between which applications may proceed towards condemnation and which may not.

In sum, the Court finds that the language of the Contracts expressly acknowledges that condemnation is not a guaranteed result, but rather an end to which the parties obligate themselves to work toward.  As such, Ordinance 05-001, in repealing Chapter 38 and its Rules, did not impair the contractual relationship between the parties.

Because the Court has found no impairment existed, no further inquiry is necessary.  As explained by the Supreme Court:

> The severity of the impairment measures the height of the hurdle the state legislation must clear.  Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.

Allied Structural Steel Co., 438 U.S. at 245 (footnote omitted).  Accordingly, the

Court finds that Ordinance 05-001 does not violate the Contracts Clause and,

therefore, DENIES Plaintiffs' motion for partial summary judgment and GRANTS

Defendant's motion for partial summary judgment with respect to Count I.

II.     Count II: Substantive Due Process

         The City moves for summary judgment with respect to Plaintiff's

claim that Ordinance 05-001 violated their right to substantive due process

guaranteed under the Fourteenth Amendment.  The Due Process Clause provides

that no State shall "deprive any person of life, liberty, or property, without due

process of law."  U.S. Const. amend. XIV.  The Ninth Circuit has held that

contracts such as Plaintiffs' may give rise to property interests protected by this

provision.  See Brewster v. Bd. of Educ., 149 F.3d 971, 982-83 (9th Cir. 1998).

         In evaluating a substantive due process claim, state action which

"neither utilizes a suspect classification nor draws distinctions among individuals

that implicate fundamental rights" will violate substantive due process only if the

action is "not rationally related to a legitimate governmental purpose."

Richardson v. City and County of Honolulu, 124 F.3d 1150, 1162 (9th Cir. 1995)

(quoting Munoz v. Sullivan, 930 F.2d 1400, 1404 (9th Cir. 1991)).  The action,

therefore, must be "clearly arbitrary and unreasonable, having no substantial

relation to the public health, safety, morals or general welfare."  Kawaoka v. City

of Arroyo Grande, 17 F.3d 1227, 1234 (9th Cir. 1994) (quoting Sinaloa Lake

Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1407 (9th Cir. 1989)).

Moreover, the court does "not require that the City's legislative acts actually

advance its stated purposes, but instead look[s] to whether 'the governmental body

could have had no legitimate reason for its decision.'"  Id. at 1234 (emphasis in

original) (quoting Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 690 (9th Cir.

1993)).

A plaintiff's burden in demonstrating that the government action is

not rationally related to a legitimate governmental purpose is "extremely high."  Id.

(citing Del Monte Dunes v. City of Monterey, 920 F.2d 1496, 1508 (9th Cir.

1990)).  As the Ninth Circuit dictated in this case,

> [t]o prove that the City's enactment of Ordinance 05-001
> violated their substantive due process rights, the
> [Plaintiffs] must demonstrate first that their contracts
> were the type of property the Due Process Clause
> protects and, second, that the City deprived them of their
> rights under the contracts in a way that 'shocks the

conscience' or 'interferes with rights implicit in the concept of ordered liberty.'

<u>Matsuda</u>, 512 F.3d at 1156 (quoting <u>Nunez v. City of Los Angeles</u>, 147 F.3d 867, 871 (9th Cir. 1998)).

Assuming <u>arguendo</u> that the Contracts are the type of property protected by the Due Process Clause, this Court finds Plaintiffs have failed to meet the "extremely high" burden of proving that Ordinance 05-001 is "not rationally related to a legitimate governmental purpose." <u>Richardson</u>, 124 F.3d at 1162. The City Council clearly articulated the reasons for repealing Chapter 38, finding that the reasons for introducing the condemnation process in the first place are no longer present to the same extent they were in 1991. (Pls.' Ex. 15 at 1.) The City Council originally enacted Chapter 38 due to "runaway land prices" and a "shortage of fee simple residential condominiums" which created the "potential for economic instability and disruption on Oahu." (<u>Id.</u>) Keeping in mind that "the use of eminent domain should not be taken lightly," the City Council, in passing Ordinance 05-001, found that the mandatory conversion of private property through the exercise of eminent domain "is no longer needed to assuage the social and economic problems" which justified Chapter 38. (<u>Id.</u>)

24

The City Council's findings clearly indicate a legitimate governmental purpose, that of restricting the use of eminent domain in light of recent economic and residential changes.  To be sure, our society places a "high value, embedded in our constitutional and political history, . . . on a person's right to enjoy what is his, free of governmental interference."  Fuentes v. Shevin, 407 U.S. 67, 81 (1972).  Because the exercise of eminent domain necessarily involves the government's coercive taking of private property, it should not be undertaken capriciously or lightly.  The City Council recognized the magnitude of this power and the inherent limitation of the exercise of eminent domain only when it is justified for a public purpose.  (Pls.' Ex. 15 at 1.)  Finding that the public purpose was no longer present, the City Council acted legitimately to repeal the process by which residents could seek condemnation.  Such an action was rationally related to a legitimate governmental purpose and, therefore, did not run afoul of the Due Process Clause.

Accordingly, this Court GRANTS Defendant's motion for partial summary judgment with respect to Count II, the claim for a violation of Due Process.

25

III.   Count III: Violation of Rights Under 42 U.S.C. § 1983

Both parties move for summary judgment with respect to Plaintiffs'

claim under 42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must

establish a deprivation of a right secured by the Constitution or laws of the United

States and that the defendant's action occurred under color of state law.  See Am.

Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).  Both the Contracts

Clause and the Due Process Clause may give rise to a claim under § 1983.  See

Matsuda, 512 F.3d at 1156; S. Cal. Gas Co., 336 F.3d at 886-87 (holding that a

Contracts Clause violation may support a § 1983 claim); Youngberg v. Romeo,

457 U.S. 307 (1982) (recognizing a plaintiff's § 1983 claim predicated on an

alleged violation of his substantive due process rights).

This Court has, however, determined that the City did not violate

Plaintiffs' rights under either the Contracts Clause or the Due Process Clause of the

Fourteenth Amendment.  Without the underlying violation of federal law,

Plaintiffs' § 1983 claim cannot stand.  The Court, therefore, DENIES Plaintiffs'

motion and GRANTS Defendant's motion with respect to Count III of the FAC.

IV.   State Law Claims

Plaintiffs' remaining state law claim are for breach of contract (Count

IV), specific performance (Count V), declaratory relief (Count VI), and injunctive

relief (Count VII).  The City specifically moves for summary judgment with respect to Counts VI and VII.

This Court, in its discretion, may decline to exercise supplemental jurisdiction over state law claims if it has dismissed the federal claims upon which jurisdiction was originally established.  See 28 U.S.C. § 1367(c)(3).  Indeed, unless "considerations of judicial economy, convenience [,] and fairness to litigants" weigh in favor of the exercise of supplemental jurisdiction, "a federal court should hesitate to exercise jurisdiction over state claims."  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) ("[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.").

The Court finds, in light of the dismissal of Counts I, II, and III, that considerations of judicial economy, convenience, and fairness to the litigants weigh in favor of declining jurisdiction over the remaining state law claims.  Such claims may be re-filed in state court, a forum which may possess a particular interest in the Contracts at issue here.

<u>CONCLUSION</u>

For the reasons stated above, the Court DENIES Plaintiffs' motions for partial summary judgment, GRANTS Defendant's motion for partial summary judgment, and DISMISSES without prejudice the remaining state law claims.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 1, 2009.



_____
David Alan Ezra
United States District Judge

<u>Barr, et al. v. City and County of Honolulu</u>, Civ No. 05-00125 DAE-LEK; ORDER (1) DENYING PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT; (2) GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (3) DISMISSING STATE LAW CLAIMS